UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| MICHAEL CIOLKOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:16cv186 |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB), as provided for in the Social Security Act. 42 U.S.C. §416(I). Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield, supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of November 16, 2007 through his date last insured of December 31, 2013 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: bacterial endocarditis requiring aortic valve replacement, seizure disorder, GERD, tinnitus, degenerative changes of the lumbar and cervical spine, compression deformities of the thoracolumbar spine, COPD, and osteoarthritis (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform work at the sedentary and light exertional levels but that he was able to stand/walk for a total of just 4 hours in an eight-hour period. He was only occasionally able to climb, balance, stoop, kneel, crouch, and crawl. He needed to avoid concentrated exposure to pulmonary irritants such as dust, fumes, and chemicals. In addition, he was unable to work at unprotected heights or operate hazardous moving machinery.

6. Through the date last insured, the claimant was capable of performing his past relevant work as a software developer (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 16, 2007, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(f).

(Tr. 19-25)

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on October 11, 2016. On December 14, 2016, the defendant filed a memorandum in support of the Commissioner's decision to which the Plaintiff replied on December 27, 2016.. Upon full review of the record in this cause, this court is of the

3

view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); *accord Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step four was the determinative inquiry.

Plaintiff filed applications for Disability Insurance Benefits on October 3, 2012 alleging disability beginning August 15, 2002. The claims were denied initially and on reconsideration, and by an Administrative Law Judge ("ALJ") on January 29, 2015. (AR 436.) Plaintiff requested review by the Appeals Council, but was denied, leaving the ALJ's decision the final decision of the Commissioner of Social Security.

Plaintiff's date last insured is December 31, 2013. He was 54 years old at his alleged onset date. Plaintiff has a more than 20-year career as a software developer for the same company.

As early as 2007, Ajay Gupta, M.D., treated Plaintiff with regular Dilantin seizure

medication which seemed to control his seizures. In 2008, Dr. Gupta discovered that Dilantin seemed to produce fatigue, lack of energy, and sluggishness. Dr. Gupta started to wean Plaintiff off Dilantin while increasing his dose of Keppra. Although controlled by medication, Plaintiff had a history of general convulsion seizures, meaning he experienced widespread, violent involuntary contraction of voluntary muscles. In 2010, Plaintiff had pain in his joints. Dr. Gupta recommended an extended release version of Keppra for Plaintiff, but his insurance did not cover it. Still controlled with medication, Plaintiff's seizures were described by Dr. Gupta in 2011 as partial seizures with impaired consciousness.

On November 1, 2012, Plaintiff slipped getting out of the tub after showering. He twisted his left ankle and Dean Mattox II, M.D., diagnosed a sprain. The fall also triggered low back pain. Plaintiff thought he may have had seizure. He felt well enough two days later to try to ride his lawn mower, but that made his back pain worse. On taking a urine test for his low back pain, it came back with blood in it. In November 2012, Robert Shugart, M.D., orthopedic surgeon, began following Plaintiff for acute back fracture from his tub fall. Plaintiff's lower back pain worsened with coughing, sneezing, and standing. Sitting or lying down helped Plaintiff's back pain. Dr. Shugart found Plaintiff's pain apparent and observed an antalgic gait. The MRI showed fractures at both L1 and L3, but also older compression fractures at other levels. Dr. Shugart recommended bracing over vertebral surgery based on his perception of Plaintiff's age and activity. He started Plaintiff on a brace for six weeks. Dr. Shugart prescribed Flexeril, a muscle relaxant, and Vicodin for pain.

In December 2012, Plaintiff presented to Dr. Mattox's office with chills, sweats, and shaking. Besides pain from fractured vertebra, he had pain from his elbow to his wrist on his right

5

arm. After years of computer work, he had right forearm pain and also weakness to his hand. He had diminished sensation to light touch in his first through third digits. Dr. Mattox and his nurse practitioner found Plaintiff to have positive Tinels and Phalens, a positive indication for carpal tunnel compression. They ordered an EMG and prescribed a wrist splint.

On January 8, 2013, Plaintiff still wore his back brace under Dr. Shugart's supervision. Plaintiff had been diagnosed with vertebral body fractures from L1 to L3. X-rays showed L1 and L3 healing, but also found notable "[c]ompression collapse." Plaintiff elected to postpone formal therapy and to follow prescribed home therapy from Dr. Shugart. At this point, Dr. Shugart anticipated that the symptoms would not resolve for 6 to 9 months. The next day, January 9, 2013, Dr. Mattox found Plaintiff slow moving due to back pain.

In October 2012, Plaintiff had an episode of his throat being blocked such that he could not swallow. He had another similar episode in November 2012. Imad E. Horani, M.D., gastroenterologist, seems to have diagnosed GERD both times and treated Plaintiff, although Dr. Horani's treatment is not fully clear from the record. Upon later examining Plaintiff and his medical record, April Morrison, M.D., opined that Plaintiff on at least one occasion had a foreign body stuck in his esophagus which required surgical repair.

In early November 2012, Plaintiff had increasing shortness of breath with minimal exertion. Dr. Mattox and his nurse practitioner urged Plaintiff to pay attention to the shortness of breath; if it worsened or he had chest pain, he was ordered to go directly to the ER.

On January 9, 2013, Dr. Mattox diagnosed shortness of breath, fatigue, pharyngitis, rhinitis, sinusitis, and erectile dysfunction, among other conditions. Plaintiff had endured chills, night sweats, headaches, sneezing, and weakness for three weeks now. Dr. Mattox hypothesized a

6

chronic infection and noted that Plaintiff seemed to get better after a Zpak but then got worse.

On January 10, 2013, Plaintiff presented to Imad E. Horani, M.D., gastroenterologist, with trouble swallowing solid food. Dr. Horani performed an upper gastrointestinal endoscopy, apparently not for the first time. Dr. Horani noted blood in Plaintiff's stool, back pain, unexpected weight loss, and history of staph infection. Dr. Horani maintained the prior Protonix prescription for Plaintiff's gastroesophageal reflux disease (GERD) and added Vicodin for pain.

In late January 2013, Plaintiff endured replacement of the valve between his left ventricle and the aorta with a valve from a pig. Upon removing the valve, the surgeon also had to patch an abscess found underneath it before placing the prosthetic pig valve. In a series of imaging done in late January as part of a broad attempt to figure out what might have triggered the infection in the heart among other conditions, a head CT was performed. The CT showed evidence of an old lacunar infarct (a type of stroke) that affected parts of his right parietal lobe.

In July 2014, when another series of imaging was conducted after a motor vehicle accident, a CT of the cervical area showed evidence of at least three additional previous lacunar infarcts: one in the right cerebellum, another in the right occipital lobe, and yet another in the left corona radiata. The record does not extrapolate further on the exact effect of these infarcts, but Plaintiff has had dizziness, among other conditions.

In support of remand or reversal, Plaintiff first argues that the ALJ erred by ignoring Plaintiff's record of multiple lacunar infarcts. Plaintiff claims that the ALJ opinion ignores the entire line of evidence as to the inevitable residual effects of Plaintiff's record of repeated prior lacunar infarcts. Plaintiff claims that the ALJ concludes without explanation that no evidence shows that Plaintiff had a stroke since 2007 and that, further, no evidence shows "that he has any

7

significant residuals from any possible past stroke."(Tr. 20). Plaintiff argues that the record shows a lacunar stroke that was old when discovered in 2013 and multiple such strokes which struck different brain areas but which were old on discovery in 2014. Plaintiff claims that the ALJ does not address these latter strokes, and does not seem to consider that one or more lacunar infarcts could have occurred since 2007 but might not have been identified as such until later discovered and deemed old. The record shows that the ALJ only acknowledges one remote stroke on record. As the Plaintiff points out, an ALJ may not ignore entire lines of evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

The record shows that Plaintiff has had lacunar infarcts that targeted at least four distinct brain regions: the right parietal lobe, the right occipital lobe, the right cerebellum, and the left corona radiata. Like other strokes, lacunar infarct symptoms vary by the area of the brain they target, and Plaintiff has nearly a complete history of substantial symptoms not fully otherwise explained.

The Commissioner acknowledges that the ALJ only considered one of Plaintiff's strokes. This court agrees with Plaintiff that it appears the ALJ failed to address evidence of multiple strokes and failed to consider the pattern of strokes that is present in the medical records. Therefore, this case will be remanded for a full inquiry into the number, nature and residual effects of all of Plaintiff's strokes.

Plaintiff next argues that the ALJ did not weigh the report of the consultative examination that Dr. Kamineni performed on June 5, 2015. The Commissioner apparently concedes that Dr. Kamineni's exam was not discussed separately in the ALJ decision, and states that "Dr. Kamineni's report does not contain any information that the ALJ did not already consider".

8

However, in light of the fact that Dr. Kamineni is an agency doctor, and "unlikely therefore to exaggerate an applicant's disability", this court feels that the exam should be fully evaluated by the ALJ upon remand. *Garcia v. Colvin*, 741 F.3d 788, 761-62 (7th Cir. 2013).

Next, Plaintiff argues that the ALJ erred by failing to properly consider Plaintiff's conditions in combination and over time. The record is a bit fuzzy in this regard, with the Plaintiff asserting that the ALJ failed to consider effects of a July 2014 car accident, among other things, with the Commissioner claiming that the Plaintiff is trying to force the ALJ to use his intuition to find Plaintiff disabled. As this case is being remanded for the reasons discussed above, the court will remand on this issue also.

Next, Plaintiff contends that the ALJ's credibility determination is erroneous. Plaintiff points out that he has had a long career as a software developer, with the same company. "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of disability." *Hill v. Colvin*, No. 15-1230, 2015 WL 7785561, at *5 (7th Cir. 2015). A long and continuous past work record with no evidence of malingering is at least a factor supporting credibility assertions of disabling impairments. *Allen v. Califano*, 613 F.2d 139, 147 (6th Cir. 1980). In response, the Commissioner notes that the record shows that Plaintiff was laid off from his last job in November 2007 because of corporate restructuring, and not because of any physical or mental limitations that prevented him from performing his job. While it is true that the Social Security Act requires that, to be found disabled, an individual must have an inability to do work caused by a medically determinable medical impairment, that does not necessarily mean that being laid off, rather than quitting, signals that the Plaintiff is not disabled. The Act only requires that a claimant not be working, and not be able to work due to a medically

9

determinable impairment. There is no specific requirement that a claimant quit work because of his impairments.  Therefore, as it appears that the ALJ was holding Plaintiff's work record against him, rather than giving him substantial credibility, the court will remand on this issue also.

## Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for proceedings consistent with this opinion.


Entered: January 4, 2017.

s/ William C.  Lee  
William C. Lee, Judge  
United States District Court